08 CV 01630

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

| | | |
|---|---|---|
| COMAIR, INC. | : | CASE NO. |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| **ADVANCED OPTIMIZATION** | : | |
| **SYSTEMS, INC.** | : | |
| | : | |
| **Defendant** | : | |

---

## COMPLAINT

---

The Plaintiff, Comair, Inc., through counsel states its cause of action as follows:

### JURISDICTION AND VENUE

1.       Comair, Inc. is a corporation with its principal office located at 77 Comair Blvd., Erlanger, KY  41018.

2.       Advanced Optimization Systems, Inc is, upon information and belief, a New Jersey corporation with its principal office located at 29 Addington Court, East Brunswick, New Jersey 08816.

3.       Jurisdiction and venue are appropriate in the United States District Court for the Southern District of Manhattan per the Purchase and License Agreement signed between the parties on November 10, 1998 and November 12, 1998.  A copy of the Purchase and License Agreement (Original PLA) is attached as Exhibit A.

4.       The amount in controversy exceeds the jurisdictional minimum of this court and the matter is properly set before the United States District Court of the Southern District of New York, Manhattan Division.

## STATEMENT OF FACTS

5.      In November of 1998 Comair, Inc. (hereinafter "Comair") signed a

Purchase and License Agreement with Advanced Optimization Systems, Inc (hereinafter

"AOS"). The agreement provided Comair a perpetual right-to-use license for AOS's

software system known as ACOS. Comair fulfilled this end of the Original PLA and

owns the perpetual right-to-use license in perpetuity. The November 1998 Original PLA

also called for an annual software maintenance service of three years. This annual

software maintenance was provided by AOS to Comair. On or about April 18, 2003 the

parties signed the Amendment to the Purchase and License Agreement (Amended PLA)

attached hereto as Exhibit B.

6.      The Amended PLA provided for a five years of maintenance with certain

renewal provisions, in addition to and a continuation of and affirmation of the perpetual

right-to-use license. The Amended PLA maintenance agreement between AOS and

Comair expired on January 26, 2008.

7.      On or about October 2007 Comair, Inc. issued an RFP to potential

maintenance vendors. The RFP included work which would potentially supplant and

replace the maintenance services provided by AOS. AOS was likewise, invited to

respond to the RFP.

8.      Upon receipt of the RFP, AOS indicated that it would not respond.

Subsequently AOS did respond, but in an inadequate manner. Comair continues to

investigate alternative maintenance providers.

## COUNT 1
## ANTICIPATED BREACH OF CONTRACT

9.      Plaintiff repeats and reiterates each and every preceeding paragraph as if fully stated herein.

10.     The Defendant, AOS, in retaliation for Comair's issuance of an RFP, has threatened to terminate Comair's perpetual right-to-use license, which Comair purchased under the Original PLA.

11.     The perpetual right-to-use licenses are Comair's property and have been dually purchased and stand separate and apart from AOS's maintenance services.

12.     AOS's threat to terminate Comair's perpetual right-to-use licenses unilaterally will cause Comair irreparable harm and negatively impact national air travel.

13.     Such a threat vests a claim of anticipatory breach in Comair because AOS would be wrongfully repudiating its contract obligations that have not yet been performed; interfering with Comair's rights.  The remaining performance by AOS is as simple as allowing Comair to exercise its perpetual right-to-use its license.

14.     AOS's threat to interfere with Comair's perpetual right-to-use license is in itself a breach of contract.

## COUNT 2
## TORTUOUS INTERFERENCE

15.     Plaintiff repeats and reiterates each and every proceeding paragraph as if fully stated herein.

16.     Comair has a right to the perpetual right-to-use license purchased from AOS in the Original PLA.

17.    AOS is tortuously interfering with Comair's contractual rights by making the threat to terminate the license. Such interference is contrary to AOS's duty under the Original PLA.

18.    AOS's tortuous interference has harmed Comair, and will continue to harm Comair. In addition, following through on the threat will cause Comair incalculable and irreparable harm.

19.    Comair is entitled to damages for AOS tortuous interference.

## COUNT 3
## TEMPORARY RESTRAINING ORDER

20.    Plaintiff repeats and reiterates each and every proceeding paragraph as if fully stated herein.

21.    Comair respectfully requests this court enter a Temporary Restraining Order, and upon hearing issue a Preliminary Injunction, preventing AOS from following through on its threat to terminate Comair's perpetual right-to-use license.

22.    The threat, if carried out, would cause immediate and irreparable harm to Comair.

23.    The threat, if carried out, would be against public policy and interfere with air travel.

24.    The Temporary Restraining Order requiring the status quo will not have a negative impact on any party and will only work to the benefit of all parties and the public. Comair does not ask this court to require AOS to take any affirmative steps, only to refrain from breaching its contractual obligations.

25.    Comair respectfully requests that this Court issue a Temporary Retraining Order and upon hearing a Preliminary Injunction, pending the conclusion of this matter.

WHEREFORE, Comair, Inc. respectfully requests this Court provide the following relief.

1.     Issue a Temporary Restraining Order in favor of Comair, Inc. and enjoining AOS from pulling its perpetual right-to-use license as described in the Original PLA.

2.     Upon hearing, to issue a Preliminary Injunction preventing AOS from pulling its perpetual right-to-use license from Comair.

3.     For judgment is Comair's favor on the underlying Complaint.

4.     For all attorneys fees, costs, and other relief to which Comair may be entitled.

Respectfully submitted,

Michael Freeman (MF-9600)
GREENBERG FREEMAN LLP
24 West 40th Street
17th Floor
New York, NY 10018
Phone: (646) 366-0881
Fax: (646) 366-1384
freemand@greenbergfreeman.com

J. Stephen Smith
GRAYDON HEAD & RITCHEY, LLP
2400 Chamber Center Drive, Suite 300
P.O. Box 17070
Ft. Mitchell, Kentucky 41017
Phone: (859) 578-3070
Fax: (859) 578-3071
ssmith@graydon.com
*Attorney for Comair, Inc.*

1608996.1



EXHIBIT

A

# PURCHASE AND LICENSE AGREEMENT

AGREEMENT made this _____ day of _____ ___, 1998 (hereinafter "this Agreement") by and between Advanced Optimization Systems, Inc. (hereinafter "AOS"), with offices at 29 Addington Court, East Brunswick, New Jersey 08816, U.S.A. and Comair, Inc. (hereinafter Customer), with offices at 2258 Tower Drive, Erlanger, KY 41018.

## 1. COVERAGE

This Agreement governs the terms and conditions agreed to by AOS and the Customer in connection with the purchase by the Customer from AOS of a Perpetual Right-to-Use License and Maintenance Services for software constituting the Automated Crew Optimization System (hereinafter "ACOS" or "Licensed Software"), as described in Attachment A (ACOS Product Summary). Also, the purchase and maintenance of computers and NT operating systems, as described in Attachment E. Additional modifications of the system may be requested by the Customer and provided by AOS subject to additional charges. Software services are detailed in Attachment B.

## 2. TERM

This Agreement shall commence upon execution by both the Customer and AOS and will remain in effect, except as otherwise set forth herein, in perpetuity. See Attachment F for the proposed implementation plan.

## 3. PRICES AND PAYMENT

a.) The Perpetual Right-to-Use License and maintenance services for the software system "ACOS", as specified in Attachment A, will be furnished by AOS for the price and fees set forth in Attachment C. The purchase price of the Perpetual Right-to-Use License, as well as, the computers and operating systems are due upon the completion of the following: delivery, installation and "acceptance", as defined in Attachment D hereof, by the Customer of the Crew Pairing Optimization System The terms and conditions are included in Attachment D. Additional services, which may be requested by the Customer, as required, shall be agreed to in writing, subject to the terms of this Agreement, where applicable, and performed on a time and materials basis at AOS' then current rates and prices.

b.) Customer agrees to purchase annual software maintenance services for "ACOS" for three years. Maintenance charges will be invoiced at the beginning of each maintenance period following the completion of the Warranty Period (as herein after defined). Customer has the right to renew, renegotiate maintenance after this period. Computer and operating system maintenance shall be

charged for on a time and materials basis after a one year warranty period. Additional services requested by Customer shall be invoiced upon completion of that work.

c.) All invoices are payable in full on a net 30 basis from the date of the invoice. After 30 days, a late charge of 2.0% per month will be added to any unpaid balance.

## 4. OWNERSHIP AND RIGHTS

Customer warrants that the Licensed Software is to be used only by and for the Customer's existing business purpose, i.e., crew planning. Customer further warrants that the Licensed Software programs are:

    a.) located at sites as specified in Attachment C,

    b.) running on number of computers (including their serial numbers) as specified in Attachment D,

    c.) used by number of users as specified in Attachment D,

    d.) hardware maybe upgraded or relocated (Customer shall notify AOS of such changes).

AOS retains ownership, as well as all other rights, title and interest in the intellectual property contained within the ACOS software programs.

AOS shall indemnify, defend and hold harmless Customer against and from any and all claims, lawsuits, judgments, losses, costs and expenses (including reasonable attorneys' fees) arising out of any claim or action made or brought against Customer, to the extent that it is based on a claim that the Licensed Software, or any part thereof, used within the scope of the license granted hereunder, infringes any patent, copyright or other proprietary right or constitutes misappropriation of a proprietary right or constitutes misappropriation of a trade secret: provided, however, that Customer notifies AOS immediately in writing of the claim and that AOS shall have sole control of the defense of any action on such claim including, but not limited to, the selection of joint counsel who shall represent both AOS and Customer, and all negotiations for its settlement or compromise. If Customer desires to retain separate legal counsel, Customer will be solely responsible for any and all legal fees, costs and expenses incurred by Customer in connection with its separate legal representation. AOS shall have no liability for any claim under this section if a claim for patent, copyright, license or trade secret infringement is based on the use of a superseded or altered version of the Licensed Software if such infringement would have been avoided by the use of modifications to the Licensed Software made available to Customer by AOS at no cost to Customer. If the Licensed Software or any part thereof as delivered by AOS becomes, or in AOS's opinion, is likely to become the subject of a claim of infringement or misappropriation of a trade secret, patent, copyright, or other proprietary right, AOS at its option and expense may:

a.) Procure for Customer the right to continue to use the Licensed Software as contemplated hereunder; or

b.) Replace or modify the Licensed Software and / or modify its use to make the use hereunder non-infringing; or

c.) Refund to Customer all license fee amounts paid by Customer hereunder. In this event, Customer shall return the Licensed Software to AOS and shall return or certify destruction to AOS of all copies thereof.

## 5. CUSTOMER RESPONSIBILITIES

Customer shall, throughout the term of this Agreement:

a.) Follow all AOS' installation, operation and service instructions.

b.) Provide the proper environment and electrical connections, including telephone lines for remote diagnostics, as specified in advance by AOS in writing.

c.) Provide access to the products to enable AOS to perform services during the Service Period Hours as defined in Attachment B, subject to applicable security requirements, and in a manner which does not disrupt Customer's regular business operations.

d.) Implement the recommended hardware configuration and operating system as specified in Attachment E.

## 6. INSTALLATION, MODIFICATION OR IMPROPER USE OF LICENSED SOFTWARE

AOS shall be under no obligation to continue to provide Licensed Software Services and will hold Customer liable for any and all damages which may result under this Agreement in the event that:

a.) Installation is performed by a person(s) other than AOS employees or authorized representatives of AOS.

b.) The Licensed Software program(s) has been modified without the written approval of AOS.

c.) The identification marks of the original Licensed Software program(s) have been removed or altered.

d.) The Licensed Software program(s) has been moved from the location where it was initially installed without the prior written approval of AOS.

e.) The Licensed Software program(s) has been used by Customer in violation of this Agreement.

## 7. SERVICES NOT COVERED

This Agreement does not cover services required to repair damages, functions, or failures caused by:

a.) Customer's failure to follow AOS' installation, operation or service instructions provided to the Customer in advance of the installation of the Licensed Software and the operation of the Licensed Software. Customer's failure to properly operate the Operating System and Associated Hardware as specified in Attachment E.

b.) Modifications or movement of the Licensed Software by other than AOS authorized personnel.

c.) Abuse, misuse, negligent or intentional acts of any kind resulting in damage or failures, or wrongful acts of any third party.

## 8. WARRANTIES

8.1 AOS hereby warrants that it has the resources and capability to assist and support Customer in the installation, implementation, and training, in respect to the Licensed Software pursuant to the terms of this Agreement.

8.2 AOS further warrants that and represents the Licensed Software shall perform the functions set forth in this Agreement, including without limitation the attachments hereto. AOS' sole and exclusive obligation under this paragraph 8.2 shall be to remedy or cause to be remedied the Licensed Software so that it performs in accordance with the functions so described herein, provided such obligation under the warranty and representation shall be in effect for a period of one year ("Warranty Period") following the date of Customer's acceptance of the Licensed Software and continue as long as annual maintenance is in effect and provided such obligation under the warranty and representation is subject further to the following conditions:

a.) the Licensed Software has been operated in accordance with the related data and instructions provided by AOS to Customer;

b.) the Licensed Software has been used by Customer under normal and appropriate operation conditions, has not been subject to misuse or neglect or refurbished, altered or repaired by Customer or a third party since delivery thereof by AOS to Customer; and

c.) Customer's use of the Licensed Software in no way violates any provision of this Agreement.

8.3 Subject to the foregoing and except where otherwise expressly provided in this Agreement, AOS MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## 9. LIMITATION OF LIABILITY

Except as expressly provided for in this Agreement, AOS SHALL IN NO EVENT BE LIABLE TO CUSTOMER, OR TO ANY PERSON OR COMPANY USING ANY PRODUCT, MATERIAL, SOFTWARE, INFORMATION, OR SERVICE SUPPLIED UNDER THIS AGREEMENT, OR TO ANY PERSON OR COMPANY TO WHOM CUSTOMER FURNISHED A PRODUCT, MATERIAL, INFORMATION OR SERVICE, FOR LOSS OF TIME, INCONVENIENCE, LOSS OF USE OF ANY PRODUCT, MATERIAL OR SOFTWARE CAUSED BY ANY PRODUCT, MATERIAL, SOFTWARE, OR INFORMATION, OR ITS FAILURE TO WORK, OR FOR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL LOSS OR DAMAGE ARISING OUT OF THIS AGREEMENT, PERFORMANCE THEREUNDER, OR ANY OBLIGATION RESULTING THEREFROM OR THE USE OR PERFORMANCE OF A PRODUCT, MATERIAL, SERVICE, SOFTWARE OR INFORMATION, WHETHER IN AN ACTION FOR OR ARISING OUT OF DELAY, NEGLIGENCE, ANY CLAIM OR LOSS, DAMAGE OR EXPENSE FROM ANY CAUSE WHATSOEVER WHICH DIRECTLY GIVES RISE TO THE CLAIM. IN NO CASE SHALL AOS' LIABILITY EXCEED EITHER THE LICENSE FEE PAID FOR THE RIGHT TO USE THE LICENSED SOFTWARE OR THE COST OF THE REPAIR / REPLACEMENT OF THE PRODUCT, MATERIAL OR SOFTWARE, WHICHEVER IS LESS.

## 10. FORCE MAJEURE

AOS SHALL NOT BE RESPONSIBLE FOR ANY DELAY, FAILURE, OR DAMAGE OF ANY KIND RESULTING FROM FIRE, FLOOD, LIGHTNING, EARTHQUAKE, STORM, FREEZING OR OTHER ACT OF GOD OR EVENT OVER WHICH AOS HAS NO CONTROL AND WHICH MAY OCCUR DURING THE TERM OF THIS AGREEMENT.

## 11. NON-WAIVER

No course of dealing or failure of either party to strictly enforce any term, condition, right, or obligation under this Agreement shall be construed as a waiver of such or other term, condition, right or obligation.

## 12. TERMINATION

Customer shall have the right upon thirty (30) days prior written notice to AOS, to terminate this Agreement in the event of nonperformance on the part of AOS, as hereinafter defined, after the failure of AOS to cure the nonperformance within said thirty (30) day period.

"Nonperformance" shall be construed to include and be limited to:

a.) Failure of the Licensed Software to produce solutions to problems in existence at the

time of the execution of this Agreement;

b.) Failure to deliver ACOS to Customer; or

c.) Breach of any provision set forth in Section 8, Section 14, Section 16, Attachment B or Attachment D hereof.

In the event of termination in accordance with this provision, Customer shall have the right to cease any and all future payment obligations and, in that event, shall return all Licensed Software and related documentation to AOS and shall certify the destruction of any and all other copies of such Licensed Software and documentation to AOS within thirty (30 ) days of such termination date.

## 13. NOTICES, APPROVALS AND OTHER COMMUNICATIONS

All notices to the parties pursuant to this Agreement shall be in writing and deemed effective when given by personal delivery or sent by registered or certified mail, return receipt requested, at the respective addresses set forth in this section or at such subsequent addresses as either of them shall have specified by written notice to the other. Any approvals or consents requested by Customer of AOS under this Agreement shall be addressed to: Warren C. Luce, Marketing Director of AOS, Inc., 29 Addington Court, East Brunswick, New Jersey 08816. U. S. A.; and any by AOS of Customer shall be addressed to: Walter Darr, Director - Flight Operations, Comair, Inc., 2258 Tower Drive, Erlanger, KY 41018.

## 14. ASSIGNMENT, TRANSFERS AND DELEGATION

Neither party shall assign or transfer any right or interest under this Agreement nor delegate any work or other obligation to be performed or owed under this Agreement without the prior written consent of the other party. Any attempted assignment, transfer or delegation in contravention of the provisions herein shall be void and ineffective. Provided, however, that notwithstanding anything herein to the contrary, Customer may assign and transfer this Agreement and all its rights, title and interest hereunder to any corporation which at the time of such assignment is a subsidiary, to any corporation with which Customer may merge or into which it may be consolidated, or to any person, firm or corporation which may acquire the majority (51%) of Customer's franchises, business or assets. Any such assignment shall not relieve Customer of its obligations under this Agreement; and Customer, as well as any subsidiary, affiliate or acquiring firm or corporation under such assignment, transfer or delegation shall be jointly and severally liable for all obligations hereunder.

## 15. CHOICE OF LAW / FORUM

The construction, interpretation and performance of this Agreement and all disputes arising under it shall be governed by the state laws of the State of New York and the federal laws of the United States

of America. Any dispute arising between the parties to this Agreement shall be referred to and be within the jurisdiction of the courts of New York.

## 16. CONFIDENTIAL INFORMATION

Any verbal or written information, documents, specifications, schedules, drawings, sketches, models, data, training materials or any other documents furnished or disclosed pursuant to this Agreement by AOS or by Customer, shall be deemed "confidential information", shall be used only for the purposes of this Agreement, and shall not be disclosed by AOS or Customer to third parties. Only Customer's or AOS' employees with a legitimate business need to know shall have access to such confidential information. No other optimization vendors shall have access to, review, or analyze the ACOS System. Customer shall make solutions available to other vendors only for "Airline Use" in other systems. No demonstrations whatsoever will be made to such vendors or any other third parties absent AOS's written permission.

## 17. YEAR 2000 COMPLIANCE

Year 2000 Compliance. All software as well as subsequent enhancements, modifications or corrections delivered by AOS hereunder containing or calling on a calendar function including, without limitation, any function indexed to the CPU clock, and any function providing specific dates or days, or calculating spans of dates or days, shall record, store, process, provide and, where appropriate inset true and accurate dates and calculations for dates and spans including and following January 1, 2000. If applicable, as part of its maintenance obligations, AOS shall consult with Customer to insure that the Application Software will (1) have no lesser functionality with respect to records containing dates both, or either, before or after January 1, 2000 and (ii) be interoperable with other software used by Customer which may deliver records to, receive records from or otherwise interact with the software in the course of Customer's data processing. The software shall be compliant before October 1, 1999 at no charge to Customer.

## 18. ENTIRE AGREEMENT

The terms and conditions contained in this Agreement including Attachments A through F supersede all prior oral or written understandings and agreements between the parties and shall constitute the entire Agreement between the parties hereto. There are no understandings or representations, expressed or implied, not expressly set forth herein. This Agreement shall not be modified or amended except by a written agreement signed by both parties, and no changes or additions to this Agreement shall be binding upon either party unless signed by an authorized representative of both parties. This Agreement shall be binding upon AOS and Comair, Inc. and their successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this contract to be executed by their duly authorized representatives.

Advanced Optimization                    Comair, Inc.
Systems, Inc.


By : _____          By : _____      By : _____


   Chi-Yen Lai                   Walter Darr                Don Bornhorst
   (Typed Name)                 (Typed Name)               (Typed Name)


V.P. Development            Dir. Crewmember Svc's      V.P. Information Services
   (Title)                      (Title)                     (Title)


_____            November 10, 1998          11/12/98
   (Date)                       (Date)                     (Date)

Attachment A

## PRODUCT SUMMARY
## AUTOMATED CREW OPTIMIZATION SYSTEM

### ACOS

The Automated Crew Optimization System ("ACOS") is a software system specifically designed to produce high quality solutions to the crew planning/pairing problems encountered in the Airline Industry. The advantage of ACOS is that it produces solutions that have better utilization of the crews. This is done by globally optimizing the crews to produce high quality solutions. The system for the purposes of this Agreement produces solutions to the daily, weekly, transition and holiday problem. ACOS includes the pilot and flight attendant version.

ACOS performs the following functions:

> Reads input data in Customer's format,
> Identifies potential crew connection problems,
> Optimizes given problems (includes warm and cold starts),
> Produces legal solutions,
> Produces detailed pairing reports including solution statistics,
> Solution outputs are produced for electronic input to the down stream system.

All systems are individually tailored to the specifics of the particular operation. The system shall be delivered with a complete user interface that is icon based and mouse operated. ACOS shall include all of Customer's crew planning rules as they existed in September 1998.

ACOS Benefits are:

> Automated solutions,
> Faster production of crew plans,
> Improved solution quality - distribution of trip lengths,
> Reduced costs,
> Flexibility to quickly produce market and contract studies,
> Ability to run long term planning scenarios.

ACOS is state of the art mathematics implemented to solve today's crew planning problem.

Attachment B

## SCOPE OF LICENSED SOFTWARE SERVICES
### Provided
### Under Purchase and License Agreement

Licensed Software Service:

Provision of Licensed Software revisions and updates required to maintain such Software at current revision level as determined by AOS.

Provision of any applicable updates of user manuals and user guides generally released by AOS to other customers.

Periodic remote checks of the performance of the Licensed Software with respect to its function and performance.

Maintenance includes materials and labor:

Hot line service during the business day will be provided.

Remote access shall be provided for preliminary trouble shooting. Telephone lines shall be provided by the Customer.

Training and Documentation:

AOS shall provide on site training as well as documentation. AOS shall train four users.

Limitations of Service:

Any Software Services required for the System due to or arising out of:

a.) abuse, misuse, negligent or similar intentional acts of any kind by Customer or any third party, or other improper use of the System by any persons or

b.) Customer's failure to provide the necessary operating system, hardware and modems as specified in Attachment E and two outside telephone lines or

c.) decomposing, modifying existing software or installing additional software, or changing the use of the system

are not covered under the applicable warrantee and maintenance services herein and will be invoiced to Customer as an additional charge.

Repairs resulting from the above will be charged at the hourly rate set forth in Attachment C.

Response Time and Services Period Hour:

For purposes of this Agreement, "Response Time" will be the time required for AOS personnel to reach the designated point of arrival once a request for the on-site Service has been received by AOS. Response time for such on-site Service, shall be the next business day plus necessary traveling time.

The time for a first response to a Customer call shall be two business hours or less.

For purposes of this Agreement, "Service Period Hours" (Business Day) will be between the hours of 8:30 a.m. and 5:00 p.m., Customer's local time Monday through Friday.

Attachment C

## SCHEDULE OF CHARGES

## Purchase Option

Initial Cost - Year One:
    Purchase - Pairing Optimizer - ACOS - Perpetual Right-to-Use License
        License shall be located at the 2258 Tower Drive, Erlanger, KY 41018 site:

| | |
|---|---|
| Pilot & Flight Attendants: | $231,000 |
| Includes: One year of warranty | |
| | |
| Purchase - PC's and Operating Systems (for three systems) | $9,440 |
| Includes: One year of warranty | |

Recurrent Costs -
    Annual Maintenance Charge - ACOS             $42,600
        ACOS shall be loaded on to three PC's.

    Maintenance for PC's and Operating System to be provided
        on a Time and Materials Basis.

        At the end of year four the maintenance agreement is completed and may be
        renewed, the right-to-use license continues into perpetuity. Each maintenance
        year is a twelve month period.

Prices are in US Dollars.

Customer shall pay transportation, all fees and taxes (FOB East Brunswick, NJ, USA).

Customer shall pay Travel and Living Expenses incurred by AOS at Actual Cost. Customer shall pre-approve.

Hourly rate for additional system modifications shall be $150 per hour plus materials, subject to the annual increases set forth in the Terms and Conditions section of this Agreement (Attachment D).

Attachment D

# TERMS AND CONDITIONS

## LICENSE AGREEMENT

Customer may assign or transfer rights to a subsidiary, a corporation with which it may merge or into which it may be consolidated, or to a corporation which may acquire the majority (51%) of Customer's franchises, business or assets.

## COMPUTING LICENSE PRICE

The price for the Licensed Software is based upon the schedule of charges set forth in Attachment C. Training, System Setup and System Tuning are based on three computers (serial numbers to be recorded) and four users. Additional planners may be added at Customer's option for a one time installation and training charge of $10,000 per planner. Additional PC's may be added for the existing planners to use for a one time installation charge of $5,000 per PC.

## INSTALLATION

Installation at the site will take two days. A list of site requirements will be provided, which shall include, but not be limited to, space, power, modem and outside telephone lines. AOS shall conduct a site survey prior to installation.

## TRAINING

Training shall be offered on-site or at AOS' offices in New Jersey. Training shall consist of an initial three-day session, with two follow-up, half day sessions scheduled after the first and second planning cycle, see Attachment F for details. One users manual per user, which includes "User Processes to Produce Solutions" and "Scenarios", two sections designed for the first-time user and which insure that high quality solutions can be produced, shall be provided to Customer. If additional training is necessary because of personnel turnover, the training of a new planner shall be done at a charge of $5,000 per new planner.

## MAINTENANCE

In order to keep the Crew Planning software current, AOS shall provide upgrades, performance enhancements and incremental changes during the warranty period and as part of the maintenance fee. New features and capabilities shall be offered at an additional charge, Customer shall pay for only those new features and capabilities which it opts to purchase. The annual maintenance fee shall also include:

    One update training session (one day).
    One Management Review / Strategy session (one day).
    Two new rules (writing, implementing & testing).
    System tuning for all fleets.

| Correction of errors or "bugs" in the Licensed Software which adversely impact its operation or output.

NOTE: AOS and Customer are aware that changes in fleet size, fleet types and market strategies will occur and that these changes may impact the optimization process. The goal of the "system tuning for all fleets" annual maintenance process is to guarantee optimal optimization for each fleet type regardless of these changes. If dramatic changes occur in areas such as fleet size, fleet types and market strategies, additional work beyond the normal system tuning may be required. In these cases all additional work required beyond normal tuning which is included as part of the annual maintenance charge will be provided on a time and materials basis agreed upon by both parties. Customer reserves the right to approve the cost in advance of actual work. The maintenance fee shall not increase more than 5% per year. This limit is for five years.

## RATE FOR ADDITIONAL WORK

Additional work shall be provided at the rate of $150.00 per hour. This is the rate applied to "Time & Material" quotes. An average rate is used and the annual increase shall not exceed 5% for the first five years.

## TRAVEL AND LIVING EXPENSES

These expenses shall be invoiced at actual cost. Customer shall provide airline tickets that are positive space. All travel and living expenses shall be pre-approved by the appropriate director.

## MISCELLANEOUS

Customer requested telecommunications, office supplies and other customer specific incremental expenses shall be invoiced at actual cost.

## HARDWARE OPTIONS

Exact hardware and operating system specifications are provided in Attachment E.

## SERVICE

Hot Line service will be provided during the Business Day. Remote access will be provided for preliminary trouble shooting. The telephone lines will be provided by the Customer. Response time will be the time required for AOS personnel to reach the designated point of arrival once the need for on-site service has been determined. Response time for such on-site service shall be the next business day plus necessary travel time. Business Day is defined as between the hours of 8:30 am and 5.00 pm, Customer's local time Monday through Friday.

## PROJECTED IMPLEMENTATION SCHEDULE

Installation of ACOS is estimated to be 90 days from contract signing and includes time necessary to integrate and test software, fine tune the optimizer and implement rules / qualities which are unique to Customer.

It is anticipated that Customer will see full value of the optimizer in the first planning cycle after installation. In the first cycle, AOS staff shall assist the Customer's planners to insure that quality solutions are produced. System acceptance occurs when Customer's planners have produced production solutions in the first cycle. Production solutions mean that each planner has produced complete solutions, and that all fleets are complete (daily, weekly, transitions and holidays - including having used cold and warm starts), FO and FA, that the solutions have been loaded into the next system successfully, and that all legalities have been met. By the third cycle, Customer's planners can expect to be producing the desired results independently.

Attachment E

# HARDWARE CONFIGURATION AND OPERATING SYSTEM

For Implementation of AOS's Automated Crew Optimization System

HARDWARE - Three Units:

    586- Intel 450 MHZ CPU
    256 MB of RAM
    8 GB Hard Drive (IDE or SCSI)
    256 KB External Cache
    1.44 MB Floppy Disk Drive
    SVGA Adapter w/ 1024 x 768 , 256 Color
    2 Serial, 1 Parallel Ports
    Desktop / Tower Case w/230+ Watts Power Supply
    3COM Network Card
    Microsoft Serial Mouse w/ pad
    56 Kbps Modem Internal
    CD ROM Drive
    17" SVGA Monitor (1024 x 768, 72 Hz or Higher)
    Uninterrupted Power Supply (500 Watts for 5 minutes)

    Additional Hardware and Software:

    3COM Office Connect 8 Port Hub - Single Unit
    PC Any Where 32 Remote and Host - Single Copy
    For the one PC that is attached to Customer's LAN, "NDS aware client" shall be installed
        by AOS.

OPERATING SYSTEM:

    Windows NT V4.0 Workstation with Installation - Three Copies

Note: Customer provides installed cabling for local area network

Attachment F

# AOS, Inc.

## *Implementation Plan*

## *for the*

## *Automated Crew Optimization System - ACOS*

AOS proposes the following implementation plan:

| | |
|---|---|
| Day 0 | Contract Signing |
| Day 69 | AOS conducts a site review and makes recommendations. |
| Day 76 | AOS installs hardware and operating system. |
| Day 90 | AOS installs ACOS - Crew Optimization Software. The system shall be production ready when installation is complete. |
| Days 93-6 | AOS trains Planners |
| Days 97-100 | Customer runs First Production Cycle with assistance from AOS. |
| 2nd Cycle | Customer runs Production Second Cycle with coaching from AOS. |
| 3rd Cycle | Customer runs Production Third Cycle with advice from AOS. |

# AMENDMENT

## TO

## PURCHASE AND LICENSE AGREEMENT



**Between Advanced Optimization Systems, Inc. and Comair, Inc.**

**Dated November 10, 1998 and Amendment dated October 17, 2000**

The parties agree to amend the above referenced Agreements as follows:

Attachment C. - Schedule of charges:  Change Recurrent Costs to:

Recurrent Costs – Annual Maintenance Charges for Pairing Optimizer - ACOS and Reports Module for the following five year periods:

| | |
|---|---|
| January 27, 2003 to January 26, 2004 | $56,000 |
| January 27, 2004 to January 26, 2005 | $62,000 |
| January 27, 2005 to January 26, 2006 | $71,300 |
| January 27, 2006 to January 26, 2007 | $82,000 |
| January 27, 2007 to January 26, 2008 | $96,750 |

At the end of the five year period the maintenance agreement is complete and may be renewed, the right-to-use licenses continue into perpetuity. AOS agrees after the five year period of maintenance, maintenance fees will not increase by more than the then current rate of CPI per annum or five percent (5%)  per annum, whichever is lower.

Add a new Attachment G. - Agreement for the Protection of Personally Identifiable Information to the Agreement which states as follows:

### AGREEMENT FOR THE PROTECTION OF PERSONALLY IDENTIFIABLE INFORMATION

by and between:

A. Comair, Inc. - hereinafter referred to as "Comair"; and

B. **Advanced Optimization Systems, Inc.** - hereinafter referred to as the "Company";

effective as of   *04/18/2003*   [MM/DD/YYYY].

§ 1 Definitions

As used in this Agreement, the following terms have the following meanings ascribed to them:

# AMENDMENT

## TO

## PURCHASE AND LICENSE AGREEMENT

**Between Advanced Optimization Systems, Inc. and Comair, Inc.**

**Dated November 10, 1998 and Amendment dated October 17, 2000**

The parties agree to amend the above referenced Agreements as follows:

Attachment C. - Schedule of charges:  Change Recurrent Costs to:

Recurrent Costs – Annual Maintenance Charges for Pairing Optimizer - ACOS and Reports Module for the following five year periods:

| | |
|---|---|
| January 27, 2003 to January 26, 2004 | $56,000 |
| January 27, 2004 to January 26, 2005 | $62,000 |
| January 27, 2005 to January 26, 2006 | $71,300 |
| January 27, 2006 to January 26, 2007 | $82,000 |
| January 27, 2007 to January 26, 2008 | $96,750 |

At the end of the five year period the maintenance agreement is complete and may be renewed, the right-to-use licenses continue into perpetuity. AOS agrees after the five year period of maintenance, maintenance fees will not increase by more than the then current rate of CPI per annum or five percent (5%)  per annum, whichever is lower.

Add a new Attachment G. - Agreement for the Protection of Personally Identifiable Information to the Agreement which states as follows:

### AGREEMENT FOR THE PROTECTION OF PERSONALLY IDENTIFIABLE INFORMATION

by and between:

A.  Comair, Inc. - hereinafter referred to as "Comair"; and

B.  **Advanced Optimization Systems, Inc.** - hereinafter referred to as the "Company";

effective as of  _04/18/2003_  [MM/DD/YYYY].

§ 1 Definitions

As used in this Agreement, the following terms have the following meanings ascribed to them:

"Comair Personally Identifiable Information" or "Comair PII" means information relating to identified or identifiable individuals, including without limitation, customer and/or employee data, such as the case may be, which information has been collected by or on behalf of Comair or it affiliates.

The terms "process," "processing" or "processed" in relation to Comair PII include, without limitation, the following operations: collection, recording, organization, storage, amendment, retrieval, consultation, manipulation and erasure.

§ 1 General

Comair has entrusted the Company with Comair PII. The Company agrees to use reasonable measures to prevent the unauthorized processing, capture, transmission and use of Comair PII which Comair may disclose to the Company during the course of Comair's relationship with the Company.

§ 2 Processing and Use of Comair PII

The Company shall process and use Comair PII solely in accordance with the provisions of this Agreement. The Company shall process and use Comair PII only for those purposes specifically described in Exhibit A to this Agreement. The Company shall not process or use Comair PII for any purpose other than the purposes set forth in Exhibit A without Comair's express prior written consent.

At any time, Comair may make inquiries to the Company about Comair PII transferred by Comair and stored by the Company, and the Company agrees to provide copies of Comair PII to Comair within a reasonable time and to perform corrections or deletions of, or additions to, Comair PII as reasonably requested by Comair.

§ 3 Comair's Inspection Rights

Comair shall have the right upon reasonable prior notice to verify the Company's compliance with the terms and conditions of this Agreement, or to appoint a third party under professional covenants of confidentiality to verify the same on Comair's behalf. The Company shall grant Comair's agents supervised unimpeded access to the extent necessary to accomplish the inspection and review of all data processing facilities, data files and other documentation used by the Company for processing and utilizing Comair PII. The Company agrees to provide reasonable assistance to Comair in facilitating this inspection function.

§ 4 Use of Subcontractors, Transmission of Comair PII to Third Parties

The Company may not transfer Comair PII to any third party without Comair's prior written consent, and then only upon such third party's execution of an agreement containing covenants for the protection of Comair PII no less stringent that those contained in this Agreement.

§ 5 Data Security

The Company shall implement, at a minimum, the data security measures and observe the minimum standards set forth in Exhibit B in order to protect Comair PII.

§ 6 Confidentiality

The obligations set forth in this Agreement are in addition to, and not in lieu of, any fiduciary duties or obligations of confidentiality or nondisclosure that the Company may have to Comair under the common law or laws providing for the protection of trade secrets. The Company shall not directly or indirectly use or disclose, except as authorized by Comair in writing, any Confidential Information (as defined below) of Comair. The term "Confidential Information" as used in this Agreement shall mean and include any information, data, and know-how relating to Comair's business that is disclosed to the Company by Comair or Comair's agent or designee as a result of the Company's relationship with Comair, and not generally within the public domain (whether constituting a trade secret or not), including without limitation, the following information: financial information, specifications, processes, products, designs, machinery, formulae, compositions, standards, drawings, methods, inventions, improvements, apparatuses, and plans; supply and service information, such as information concerning the goods and services utilized or purchased by Comair, the names or addresses of suppliers, terms of supply or service contracts, or of particular transactions, or related information about potential suppliers, to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of a particular supplier, though generally known or available, yields advantages to Comair the details of which are not generally known; marketing information, such as details about ongoing or proposed marketing programs or agreements by or on behalf of Comair, marketing forecasts or results of marketing efforts or information about impending transactions; personnel information, such as employees' personal or medical histories, compensation or other terms of employment, actual or proposed promotions, hirings, resignations, disciplinary actions, terminations or reasons therefore, training methods, performance, or other employee information; customer information, such as any compilation of past, existing, or prospective customers, customer proposals or agreements between customers and Comair, status of customer accounts or credit, or related information about actual or prospective customers; and Comair PII. The term "Confidential Information" does not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right of Comair or the customer to which such information pertains.

Notwithstanding any other provision of this Agreement to the contrary, the obligations of confidentiality and nondisclosure contained in this § 6 shall survive the termination or expiration of this Agreement for any reason for a period of 3 years; provided, however, that with respect to those items of Confidential Information which constitute a trade secret under applicable law, the Company's obligations of confidentiality and nondisclosure shall survive after such 3-year period to the greatest extent permitted by applicable law.

§ 7 Term of the Agreement

This Agreement shall become effective as of the date first above written and the parties obligations under this Agreement shall terminate on the date that the Company ceases to hold any item of Comair PII.

§ 8 General Provisions

This Agreement and the Purchase and License Agreement set forth the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes any prior or contemporaneous agreements with respect thereto, whether written or oral. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach, and no waiver shall be valid unless in writing and signed by the party against whom such waiver is sought. If one or more provisions of this Agreement is deemed invalid or unenforceable, the validity and legality of the remaining provisions hereof shall not be affected. This Agreement shall be governed by the laws of the State of New York , USA, without regard to principles of conflicts of laws.

[Remainder of Page Intentionally Left Blank].

**ACKNOWLEDGED & AGREED:**

Advanced Optimization Systems, Inc.

Signature: _Warren C. Luce_
Print: _WARREN C. LUCE_
Company: _AOS_
Title: _Marketing Director_

**Comair, Inc.**

Signature: _Sherri Kurlas-Schalk_
Print: _Sherri Kurlas-Schalk_
Title: _Director Information Technology_

## EXHIBIT A

### Description and Authorized Uses of Comair PII

- **Complete description of data transferred including each field type.**

  Future flight schedules – some of which may not be common knowledge, not yet published
  Flight connection information
  Flight date
  Scheduled departure time
  Scheduled arrival time
  Equipment type
  Departure city
  Arrival city
  Frequency of flight
  Employee number
  Employee seniority number
  Hotel name (used by crewmembers)
  City in which hotel is located
  Hotel phone number
  Negotiated room rates
  Rules in our contracts with pilots & flight attendants

- **All intended uses of data transferred.**

  Support and maintenance of the ACOS and Reports Module products.

  In the event of a Comair Bid Production staffing issue (i.e. shortage), AOS may be asked to use our data in a production mode – create a schedule for us.

## EXHIBIT B

Data Security

1. Access of Persons: The Company agrees to use reasonable measures to prevent unauthorized persons from gaining access to the data processing equipment or media where Comair PII is stored or processed. The Company agrees to provide its employees and agents access to Comair PII on a need-to-know basis only and agrees to cause any persons having authorized access to such information to be bound by obligations of confidentiality, non-use and non-disclosure no less stringent than those imposed upon the Company by this Agreement.

2. Data Media: The Company agrees to use reasonable measures to prevent the unauthorized reading, copying alteration or removal of the data media used by the Company and containing Comair PII.

3. Data Retention: The Company shall not retain Comair PII any longer than is reasonably necessary to accomplish the intended purposes for which Comair PII was transferred as specified in Exhibit A. Upon the earlier termination of this Agreement or the written request of Comair, the Company shall delete and/or destroy all Comair PII in the Company's possession, including any copies thereof, and shall deliver a written statement to Comair within 15 days of Comair's request confirming that the Company has done so.

4. Data Memory: The Company agrees to use reasonable measures to prevent unauthorized data input into memory and the unauthorized reading, alteration or deletion of Comair PII.

5. Personnel: Upon request, the Company shall provide Comair with a list of the Company's employees entrusted with processing the Comair PII transferred by the Company, together with a description of their access rights.

6. Transmission: The Company agrees to use reasonable measures to prevent Comair PII from being read, copied, altered or deleted by unauthorized parties during the transmission thereof or during the transport of the data media on which Comair PII is stored.

7. Systems Access: In the event the Company accesses Comair's Confidential Information by electronic means (including, without limitation, by remote or direct connection to Comair's computer systems, intranet, databases or extranet), the Company, shall observe the following covenants:

   (i) Access to Comair's computer systems, intranet, databases or extranet is not granted by this Agreement. Any such access shall only be exercised by the Company after the execution of the Vendor Network Access Agreement, attached hereto as Attachment H.

   (ii) The Company shall only access, use, or modify the Confidential Information and related computer systems and files that Comair expressly authorizes it to access, use, or modify ("Permitted Systems"), notwithstanding that other Confidential Information and related computer systems and files may be accessible to the Company.

(iii) The Company shall not permit or allow any unauthorized person or third party to access, use, or modify the Permitted Systems.

(iv) The Company shall, at a minimum, comply with any written guidelines from Comair related to remote or direct access; provided, however, that the Company shall remain solely liable for the breach of any other obligations under this Agreement, notwithstanding the Company's compliance with such guidelines.

(v) The Company shall take commercially reasonable efforts to avoid the introduction into Comair's computer systems, intranet, databases or extranet, by way of remote or direct access or otherwise, of any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," "preventative routines" or other computer software routine designed: to permit unauthorized access to or use or modification of either the Confidential Information or Comair's computer systems intranet, databases or extranet; to disable, modify, damage or delete the Confidential Information, or any data, computer hardware or other equipment or software operated or maintained by Comair; or to perform any other such similar actions

Add a new Attachment H. – Vendor Network Access Agreement to the Agreement which states as follows:

## VENDOR NETWORK ACCESS AGREEMENT

<Every AOS employee accessing the system must complete this document>

In support of Automated Crew Optimization System, <user-name>, representing AOS is permitted remote access to the Comair network.

The undersigned agrees to access via modem only the Automated Crew Optimization System and the associated database on the Comair network. Unauthorized access to any other Comair applications without Comair's consent will result in the loss of remote access to Comair's network.

Due to Comair network security procedures, when remote access is required, AOS must notify Comair prior to access. Upon completion of the needed access, AOS should notify Comair accordingly. For events scheduled through Comair's Change Management Process (i.e. release installs, routine maintenance, etc.), prior notification may be made with Comair in advance of the remote access for specific time frames.

In the event of the undersigned no longer requiring Comair network access due to reassignment, termination, or any other reason precluding the need for Comair network access, either the undersigned or AOS will inform Comair of the need to discontinue network access for the undersigned.

**Signature**

**Print Name and Company**

Add a new Attachment H. – Vendor Network Access Agreement to the Agreement which states as follows:

## VENDOR NETWORK ACCESS AGREEMENT

<Every AOS employee accessing the system must complete this document>

In support of Automated Crew Optimization System, <user-name>, representing AOS is permitted remote access to the Comair network.

The undersigned agrees to access via modem only the Automated Crew Optimization System and the associated database on the Comair network. Unauthorized access to any other Comair applications without Comair's consent will result in the loss of remote access to Comair's network.

Due to Comair network security procedures, when remote access is required, AOS must notify Comair prior to access. Upon completion of the needed access, AOS should notify Comair accordingly. For events scheduled through Comair's Change Management Process (i.e. release installs, routine maintenance, etc.), prior notification may be made with Comair in advance of the remote access for specific time frames.

In the event of the undersigned no longer requiring Comair network access due to reassignment, termination, or any other reason precluding the need for Comair network access, either the undersigned or AOS will inform Comair of the need to discontinue network access for the undersigned.

_Tony Pien_
**Signature**

_TONY PIEN / Advanced Optimization Systems, Inc._
**Print Name and Company**

Add a new Attachment H. – Vendor Network Access Agreement to the Agreement which states as follows:

## VENDOR NETWORK ACCESS AGREEMENT

<Every AOS employee accessing the system must complete this document>

In support of Automated Crew Optimization System, <user-name>, representing AOS is permitted remote access to the Comair network.

The undersigned agrees to access via modem only the Automated Crew Optimization System and the associated database on the Comair network. Unauthorized access to any other Comair applications without Comair's consent will result in the loss of remote access to Comair's network.

Due to Comair network security procedures, when remote access is required, AOS must notify Comair prior to access. Upon completion of the needed access, AOS should notify Comair accordingly. For events scheduled through Comair's Change Management Process (i.e. release installs, routine maintenance, etc.), prior notification may be made with Comair in advance of the remote access for specific time frames.

In the event of the undersigned no longer requiring Comair network access due to reassignment, termination, or any other reason precluding the need for Comair network access, either the undersigned or AOS will inform Comair of the need to discontinue network access for the undersigned.

_____
**Signature**

WANG - Fu SHYI , AOS
_____
**Print Name and Company**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representative.

Accepted for:
Advanced Optimization Systems, Inc.

By: _____

WARREN C. LUCE
        (Typed Name)

_____
        (Title)

4/22/03
        (Date)

Accepted for:
Comair, Inc.

By: _____

Sherri Kurlas-Schalk_____
        (Typed Name)

Director Information Technology
        (Title)

4/18/03
        (Date)